MAKAR, J.,
concurring with opinion.
Lawyers and alcohol do mix, so frequently that our profession’s rate -of substance abuse justified the establishment thirty years ago of a unique organization, Florida Lawyers Assistance, Iric., to provide confidential assistance to members of the Bar for a wide range of personal afflictions. See Florida Lawyers Assistance, http://fla-lap.org/ (last visited December 16, 2015). Judges, lawyers, and law students — whether for themselves or others— may seek FLA’s assistance without the fear that FLA will tell the Bar, employers, family, or friends. Id. “FLA believes .it is the responsibility of the legal community to help our colleagues who may not recognize their need for assistance.” Florida Lawyers Assistance, About, http://fla-lap. org/about/ (last visited December 16, 2015). The entire December 1999 issue of The Florida Bar Journal was devoted to this topic. See, e.g., Richard B. Marx, Impairád Attorneys and the Disciplinary System, 73 Fla. B.J. 14, 14 (December 1999) (estimating that roughly fifteen percent of Florida Bar members — about 10,-000 of the 64,800 total membership in 1999 — were at risk of developing a problem with drugs or alcohol during their careers; there are now over 100,000 members).
To that end, a wealth of resources exists to help attorneys (including judges) with emerging or existing alcohol issues and how they, ought to be addressed from a therapeutic perspective. The literature, including FLA’s brochure designed solely for judges’ use, generally takes a remedial approach, seeking graduated curative measures versus a castigatory approach. See Florida Lawyers Assistance, Impairment in the Legal Profession: A Guide for Judges, http://fla-lap.org/wp-content/ uploads/2009/08/Brochurel-Judges.pdf (last visited December 16, 2015); see also Anonymous, A' View From The Bench, 73 Fla. B.J. 39, 39 (December 1999) (trial judge’s discussion of how he/she — as a recovering alcoholic — handled such matters). This approach places trial judges *735 in a parentalistic role, that of supervising attorneys and protecting their clients— and thereby the judicial system — via intervention when appropriate in a firm but compassionate manner, deploying incrementally the resources and judicial tools necessary to determine the nature of the possible problem and its correction, sometimes simply via informal judicial persuasion. Because of the sensitive nature of addictions of all kinds, including their medical dimensions and employment ramifications, protocols that allow for the confidential pursuit of psychological and other therapeutic services can be accomplished judicially while ■ simultaneously protecting the dignity of the courtroom and the orderly dispensation of justice.
Research has found no Florida “playbook” for what judges should do when an attorney in a courtroom is reported as smelling of alcohol but exhibiting no signs of diminished capacity, inappropriate behavior, or deficient representation. Judiciousness, however, counsels that a circumspect and restrained approach be followed, criminal contempt being a trump card to be played only when absolutely necessary and all else fails; we’re taught that at new judges’ college. The reasons are both prudential and legal: even where impairment is obvious,, the remedy of contempt is not easily established because it requires proof beyond a reasonable doubt of some willful act or omission by a defendant that was calculated to hinder the orderly functions of the court. See Woodie v. Campbell, 960 So.2d 877, 879 (Fla. 1st DCA 2007). Thus, where a defendant’s impairment manifests itself in a dramatic way, such as passing out in the courtroom after having ingested cocaine, a seemingly straightforward case of direct contempt would seem to be presented. See, e.g., Miller v. State, 672 So.2d 95 (Fla. 3d DCA 1996). As the majority in Miller recounted:
During the course of his appearance on an unrelated charge of indirect contempt, the defendant-appellant passed out in the courtroom and could not ■readily be revived because he had “had a little coke” that morning.[1] We conclude that the trial court properly found that this conduct obstructed the administra *736 tion of justice in the case so as to justify a finding .of direct criminal. contempt.
672 So.2d at 95-96 (per Schwartz, C.J.); But judicial minds differed. The dissent in Miller would have overturned the contempt conviction, pointing to the lack of any evidence that the doped-out defendant intended to be disruptive. Although the defendant “may very well have inexcusably been as ‘high as a Georgia pine’ when he entered the courtroom and momentarily dozed off’ the record was “completely devoid of any evidence that the appellant’s behavior was otherwise contumacious or served to significantly hinder or disrupt the orderly flow of the court’s proceedings[.]” Id. (Green, J., dissenting). Rather, the defendant'“addressed the court at all times in a most respectful, docile, and courteous manner and at no time created any., outbursts.” Id. at 96. The dissent further noted that similar interruptions in Dade .County’s courtrooms at the time were common. Id. at 97 (“Anyone with any familiarity with the day to day operations of.our congested trial courts knows first hand that delays in courtroom proceedings due to an occasionally ‘snoozing’ litigant, witness,.juror, lawyer, (or for that matter, judge) who may or may not be under the influence of anything are commonplace.”).
Prior to Miller, no reported Florida decision had held a person'in direct contempt “based solely upon his appearance before the court under the influence of, an illegal substance and/or alcohol.” Id. Nor has any other to date, probably because contempt is difficult to establish and reservedly used. “Other jurisdictions which have considered this issue have resoundingly rejected such an act as a sole- basis for criminal contempt.” ■ Id. " (citing cases). They recognize “that the per se act of appearing before the court under the influence of drugs and/or alcohol, as odious as it may be, is not a sufficient basis to sustain a finding of criminal contempt.” Id.; see generally Joan Teshima, Annotation, Intoxication of Witness or Attorney as Contempt of Court, 46 A.L.R.4th 238 (2015) (collecting the literal handful of cases on the topic). To be clear, the lack of caselaw-directly on point doesn’t mean there is not a problem' out in the field; there is.- But the sanction of criminal contempt is a tool of last resort, reserved for only the most egregious cases where contemptuous intent is evident. Berman v. State, 751 So.2d 612, 616 (Fla. 4th DCA 1999) (“Although the power to punish for contempt is essential to the administration of justice, the criminal contempt power should be' used cautiously and sparingly and reserved for those instances in which the conduct is calculated to hinder, embarrass, delay or obstruct justice.”) (citations omitted); see, e.g,, Ridge v. State Bar, 47 Cal.3d 952, 254 Cal.Rptr. 803, 766 P.2d 669, 571 (1989) (visibly intoxicated attorney at preliminary hearing, upon whom the judge smelled alcohol, who slurred his speech and kept dropping exhibits, who acted inappropriately aggressive to counsel and witnesses, who had a .17 blood alcohol level, and who lied about number of beers had, held ini direct contempt)
Turning to this case, I fully concur in Chief Judge Roberts’s opinion, which concludes that due- process was lacking in two ways (no basis for use of breathalyzer and lack of notice to the attorney that she was the subject of a contempt proceeding) and that the use of protective custody did not meet statutory requirements. Even absent these violations of law, the record is bereft of any evidence that the attorney was contemptuous. The attorney appeared respectful, compliant, truthful, and prepared to proceed with the hearing. No evidence supported an intent on the attorney’s part to “hinder, embarrass, delay or obstruct justice.” To the contrary, despite believing her workday was over, she left home to come to the plea hearing. Per *737 haps she could have called in to tell the judge that she’d “had a drink at lunch” so that the hearing could be reset, a suggestion the trial judge made; but, doing so could have been viewed by the trial judge as contemptuous because it caused “disruption” of the proceedings.
A few observations. First, the Court’s opinion in no way hampers the ability of judges to control their courtrooms; after all, nothing of record establishes that contemptuous behavior occurred or was likely to occur. None of the lengthy laundry list of “warning signs” in FLA’s brochure — the one designed for trial judges — existed. See Florida Lawyers Assistance, Impairment in the Legal Profession: A Guide for Judges. A spectrum of intermediate methods of addressing “alcohol on the breath” situations exists short of full-blown criminal contempt proceedings against attorneys, witnesses, and other court participants. The judicial tool cabinet is adequately, stocked to address almost all courtroom situations without pulling out the sledge hammer precipitously; doing so has the feel of the classic animation film “Bambi Meets Godzilla.” See Bambi Meets Godzilla, https://en.wikipedia.org/ wiki/Bambi_Meets_Godzilla (last visited December 16, 2015). Careers and reputations can be irreparably harmed or destroyed by public accusations of substance abuse, which is part of the reason why charging, an attorney in open court with contemptuous conduct triggers constitutional protections.
Second,' criminal contempt proceedings are costly, putting a strain on scarce judicial resources, which is why informally counseling attorneys suspected of substance abuse is a preferred, if not superior, approach, consistent with the adage that we should “praise -in public, criticize in private.” As an example, the trialjudge at the contempt hearing announced that he had informally met in his chambers with the attorney, at the attorney’s urging, at which time she advised-the judge of some unspecified personal- conditions and problems, asking the judge “to make sure that she in fact does what she is supposed to do in court and hold her accountable[.]” Having an informal network of attorneys, or even judges, as a sentry is laudable; it is consistent with the goals of the organized Bar and FLA that substance abuse is a serious but treatable affliction. The trial judge, to his credit, takes seriously that attorneys are to be on their best behavior in his courtroom and undertook to look out for this attorney, though it appears the attorney and judge miscommunicated ,'on what that meant exactly in practice. A quiet sidebar, followed by a continuance, concluding with private judicial words spoken to the attorney’s employer may save a career; breathalyzing attorneys in court, holding them in “protective custody,” and imposing criminal contempt sanctions is a surefire way to ruin one.
Finally, Florida currently has 921 trial judges (599 circuit and 322 county), who have — in large measure — broad discretion as to how they handle these situations. But other than anecdotes, no data or protocols appear to exist showing how that discretion is or should be exercised. An obvious tension exists between the role that trial judges play as avuncular figures looking out benignly for the best interests of lawyers who appear, before them and the prosecutorial role judges play when they decide to punish criminally those who stray from standards of decorum in their courtrooms. Frequent mention is made in the transcripts of an incident that arose in the local jurisdiction that apparently influenced the trial judge’s stern approach. It is unclear how often and under what circumstances other Florida judges are requiring lawyers, witnesses or others suspected of having consumed alcohol to take breathalyzers during court proceedings *738 and how those procedures and results are subject to challenge.[2] It’s doubtful that one-size-fits-all when it comes to establishing best practices, but it may be worth considering given the therapeutic and remedial approach that the judiciary and Bar support, the lack of clear guidance for trial judges to follow, and the gauntlet of indignities the attorney in this case experienced (detention, monitoring devices, and so on). Without a doubt, attending court intoxicated violates the rules of professional conduct for which remedies exist, see Florida Bar Code of Professional Conduct 4-8.4; The Fla. Bar v. Scofield, 287 So.2d 285 (Fla.1973), but the judicial remedy of criminal contempt, is a hand that should not be overplayed.

. The pertinent colloquy is as follows:
THE COURT: Page 10, Johnny Miller.
PROBATION OFFICER: I am not sure, he is under the influence of something. (Whereupon the Defendant was called several times)
THE COURT: Mr. Miller, it appears you might be under the influence of something, is that correct? Let’s try the truth.
THE DEFENDANT: M’am.
THE COURT: Are you under the influence of some drug at this time?
THE DEFENDANT: M’am.
THE COURT: I am going to have you tested. Can you hear me? Mr. Miller, it appears you may be under the influence of some controlled substance?
ATTORNEY: She said she thinks you are under the influence of some drugs or something, are you?
THE DEFENDANT: Inaudible.
ATTORNEY: He said he is on antibiotics. He got some sort of flu. English translation. THE COURT: Mr. Miller,- listen to me. At this time I am going-;to have them do a urine test on you.
THE DEFENDANT: Yes M'am.
THE COURT: Unless you want to tell me about what you had this morning.
THE DEFENDANT: Allí did-was sat down for a while, I fell aslpep.
THE COURT: If you are not going to tell what ydu are under; we will do a urine test and we will find out. If you are clean, no problem. ->If you are' not clean then you have a problem.
THE DEFENDANT: I had a little coke.
THE COURT: You had'a little coke this morning? ■[1]
THE DEFENDANT: Yes, M’am.
THE COURT: You come, to court on a contempt proceedings completely gone? What is wrong with you?
I need’to think about this. Have a seat. We need to think about -what needs to be done. ■
672 So.2d at 96 n. 1,

. This practice raises other questions such as whether the legal standard of intoxication while driving a motor vehicle or shooting a gun is the appropriate one in this context. Or may judges apply a more stringent standard, such as the one used in some workplaces where blood alcohol levels of .02 or less can be grounds for discipline? What degree of objective evidence of impairment legitimates the use of a breathalyzer in court? Questions outnumber answers in this field.